UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Haishan Yang, <br><br> Plaintiff, <br><br> v. <br><br> Hannah Neprash, Scott Lanyon, JaneAnne Murray, and Sharon Dzik, in their individual and official capacities, <br><br> Defendants. | Civil No. 25-cv-00089-JMB-SGE <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

---

Pursuant to Rule 12(b)(6) of Federal Rules of Civil Procedure, Defendants Hannah Neprash, Scott Lanyon, JaneAnne Murray, and Sharon Dzik ("University Officials") respectfully move the Court to dismiss with prejudice Plaintiff Haishan Yang's amended complaint.

Yang's amended complaint is barred to the extent that he seeks money damages by the Eleventh Amendment. Moreover, Yang has failed to exhaust his administrative remedies, as he must before coming to this Court, because his suit challenges the University of Minnesota's decision to expel him, a quasi-judicial decision that can only be challenged by writ of certiorari to the Minnesota Court of Appeals. In addition, the allegations in his amended complaint make clear that the University Officials provided him with due process in the expulsion process, meaning he has not stated a claim upon which relief can be granted.

For these reasons, the University Officials respectfully ask the Court to dismiss Yang's amended complaint with prejudice in its entirety.

## STATEMENT OF FACTS

Haishan Yang was a third-year Ph.D. student in the Division of Health Policy and Management in the School of Public Health at the University. (Am. Compl. (Doc. 10) ¶ 7.) In August 2024, he took the written preliminary examination that is required of all students to advance to the next stage of the program. (*Id.*) The instructions for the written preliminary exam expressly stated that students "may not use any sort of Artificial Intelligence tools, such as ChatGPT, in any part of this exam." (Am. Compl. Ex 1 (Doc. 10-1) at 1.)

1. **The Grading Committee investigates concerns that Yang used artificial intelligence in completing his preliminary exam and refers the matter to the University's Office for Community Standards.**

A committee of four faculty members ("Grading Committee"), including Professor Neprash, reviewed Yang's written preliminary exam and concluded that Yang used artificial intelligence—specifically, a large language model like ChatGPT—in preparing his answers. (Am. Compl. (Doc. 10) ¶¶ 8–10.) In reaching that conclusion, the Grading Committee raised a number of concerns. (Am. Compl. Ex. 4 (Doc. 10-4) ¶ 1.) Specifically, every member of the Grading Committee thought that Yang's written preliminary exam "did not seem to be written in the student's voice and noted instances where answers seemed to not be directly relevant to the question, or involved concepts that were not covered in class or the readings." (*Id.*) All four faculty members "had

significant concerns that some sort of large language model/generative AI model was used in the answers." (*Id.*)

The Grading Committee submitted Yang's written preliminary exam questions to ChatGPT and compared the output to Yang's answers in an effort resolve these concerns. (*Id.* ¶ 2.) The Grading Committee identified several excerpts in the ChatGPT output that closely mirrored Yang's written preliminary exam answers. (*Id.*) Similarities included specific instances of language usage, structure, and matching content. (*Id.* ¶ 2.) In reviewing Yang's answer to Question 1 of the written preliminary exam, for example, the Grading Committee members were struck that both Yang and the ChatGPT output identified the same three examples of market failure, despite the availability of many additional relevant examples. (*Id.*) Additionally, in Part C of Question 4, both Yang and the ChatGPT output opened discussion of implementation methods with the same two unconventional, though only "somewhat relevant," methods, the mention of which the Grading Committee thought was "very unusual in the context of this exam." (*Id.*)

The Grading Committee also considered other examples of Yang's writing. (*Id.* ¶ 4.) While preparing for the written preliminary exam, Yang had solicited feedback from faculty on his answers to practice question that had been provided to students to prepare for the written preliminary exam. (*Id.*) In grading Yang's answers to the written preliminary exam, one member of the Grading Committee identified similarities with Yang's responses to the practice questions. (*Id.*) As a result, the faculty member generated ChatGPT responses to the practice questions and compared those to Yang's practice

3

answer, leading to the conclusion that there was "strong evidence" that Yang had used ChatGPT to in answering the practice questions. (*Id.*)

Finally, the Grading Committee compared the writing in Yang's answers to the written preliminary exam to a handwritten (i.e., verifiably Yang's) exam response Yang had submitted in the Fall 2022 semester. (*Id.* ¶ 5.) The Grading Committee noted "many dissimilarities" between the writing styles employed in the two exams. (*Id.*)

As a result of these findings, the Grading Committee referred the matter to the University's Office for Community Standards, which adjudicates suspected violations of Board of Regents Policy: *Student Conduct Code*, and the Grading Committee recommended that Yang be expelled for scholastic dishonesty. (Am. Compl. (Doc. 10) ¶ 10.)

2.  **The Campus Committee on Student Behavior conducts a hearing into the allegations of scholastic dishonesty, resulting in Yang's expulsion.**

The University's Board of Regents Policy: *Student Conduct Code* bars the unauthorized use of online resources as scholastic dishonesty.[1] University of Minnesota,

---

[1] The Court may "take judicial notice of public records" like publicly available University policy and procedure documents and "may thus consider them on a motion to dismiss." *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003); *see also* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is no subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). In the Eighth Circuit, motions to dismiss "are not automatically converted into motions for summary judgment" as a result of one party submitting, in support of their position on the motion, additional documents that are in the public record. *Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999).

Board of Regents Policy: *Student Conduct Code*, https://regents.umn.edu/sites/regents.umn.edu/files/2024-05/policy_student_conduct_code.pdf. Any student alleged to have violated the *Student Conduct Code* has the opportunity to receive a fair hearing, and findings of responsibility against the student must be supported by the preponderance of the evidence. (*Id.* at 8, § VII(1).) Specifically, the *Student Conduct Code* provides that "students are entitled to due process and procedural fairness protections, including the prompt notification of charges, the opportunity to respond, the right to an advocate of choice, and the right to the resolution of a case within a reasonable period of time." (*Id.* at 2, § II(h).)

After the Office for Community Standards received the Grading Committee's report about Yang, Sharon Dzik, Director of the Office for Community Standards, met with Yang. (Am. Compl. Ex. 7 (Doc. 10-7) at 2.) Following this meeting, the Office for Community Standards sent Yang a letter finding him responsible for violating the *Student Conduct Code*'s scholastic dishonesty provision and offering him an informal resolution of expulsion. (*Id.*) Yang rejected the informal resolution and asked instead for a formal hearing before the University's Campus Committee on Student Behavior. (*Id.*) The Campus Committee on Student Behavior "is the central body for the Twin Cities campus in matters involving violations of the *Student Conduct Code* and is composed of faculty, academic professional, and student members." (*Id.* at 3.)

A five-member panel of the Campus Committee on Student Behavior conducted a formal hearing into the allegations against Yang on November 14, 2024. (*Id.* at 3.) At the hearing, Yang was represented by an advocate from the University's Student Advocate

Services, through whom Yang was able to question witnesses, present evidence, and respond to written statements that were used as evidence against him. (*Id.*; Am. Compl. ¶ 18.)

At the hearing, Yang's advocate questioned Professor Neprash about the ChatGPT output generated as a result of the Grading Committee's suspicions that Yang had used artificial intelligence in completing his written preliminary exam. (Am. Compl. Ex. 6 (Doc. 10-6) at 123–34.) The advocate also generated responses from the free version of ChatGPT during the hearing and asked Professor Neprash about differences between that output and the ChatGPT output the Grading Committee had generated. (*Id.* at 130–34.) During this line of questioning, Director Dzik, who was presenting information on behalf of the University at the hearing, asked that Dzik, Yang's advocate, and Professor JaneAnne Murray, the Chair of the Campus Committee on Student Behavior, have a brief discussion. (*Id.* at 134.) After this discussion, Professor Murray explained that line of questioning would not continue because the Campus Committee on Student Behavior "do[es]n't create new evidence." (*Id.*) Yang's advocate also questioned another member of the Grading Committee, Yang himself testified, and Yang offered evidence. (Am. Compl. Ex. 7 (Doc. 10-7) at 3.)

On November 26, 2024, the Campus Committee on Student Behavior wrote to Yang to inform him of the hearing panel's unanimous finding that he was responsible for violating the scholastic dishonesty provision of the *Student Conduct Code*. (*Id.*) The Committee articulated a number of reasons that it found that Yang had violated the *Student Conduct Code*, including the University's "compelling" presentation, the

6

testifying professors' ability to identify artificial intelligence-generated papers, Yang's use of documents "that were demonstrated to be irrelevant to the exam questions," the lack of citations in Yang's exam answers, Yang's "pattern of excuses about exam errors," and inconsistencies in Yang's testimony. (*Id.*)

### 3.  Yang's appeal of the Campus Committee on Student Behavior's decision is denied.

After receiving the Campus Committee on Student Behavior's decision, Yang timely filed an appeal to the University's Vice Provost Scott Lanyon, who served as the University's appellate officer. (*Id.* at 2.) Yang raised four grounds for appeal: new, previously unavailable evidence sufficient to affect the outcome of the hearing; significant procedural error sufficient to affect the outcome; lack of substantial information; and outcome grossly disproportionate to the offense. (*Id.* at 3–4.)

Yang argued that the ChatGPT output generated by Professor Ezra Golberstein, another member of the Grading Committee, and the original ChatGPT output generated by Professor Neprash (as opposed to the report submitted to the Office for Community Standards) were submitted late in the Campus Committee on Student Behavior hearing. (*Id.* at 4.) Vice Provost Lanyon rejected this ground for appeal, finding that, even though Professor Golberstein's ChatGPT output and Professor Neprash's original ChatGPT output were submitted late in the hearing, the CCSB panel still had access to and could consider that evidence in its deliberations. (*Id.* at 4–5.) Vice Provost Lanyon also reasoned that it was not clear that this information was previously unavailable, as Yang claimed, given that there was no record of Yang having requested that information before

the hearing. (*Id.* at 4.) Vice Provost Lanyon also found that earlier submission of that evidence would not have changed the outcome of the hearing because "[t]he same markers of the use of AI (for example, the unusually long answer, structured writing style, non-standard content for the field, a writing style/voice that is dissimilar to other written assignments by the student) are present, regardless." (*Id.* at 4.)

Nor did Vice Provost Lanyon find credible the assertion that Professor Neprash intentionally altered the ChatGPT output to mimic Yang's answer, noting that nothing in the record suggested Professor Neprash had any motivation to act counter to Yang's interests and that Yang did not object to Professor Neprash's inclusion on the panel that graded Yang's written preliminary exam. (*Id.*)

Yang also submitted as previously unavailable evidence a "forensic analysis" conducted by a faculty member at Seattle University of the alleged differences in the ChatGPT output submitted to Office for Community Standards and the original ChatGPT output generated by Professor Neprash. (*Id.* at 4–5; Am. Compl. Ex. 5 (Doc. 10-5).) Vice Provost Lanyon declined to add the information to the record because "it does not provide any information that was not before the panel during their deliberations." (Am. Compl. Ex. 7 (Doc. 10-7) at 4–5.)

As procedural error, Yang argued that Professor Neprash should not have been permitted to submit a link to her original ChatGPT output during the hearing. (*Id.* at 5.) Vice Provost Lanyon found no error here because Professor Neprash submitted the link at the request of Yang's advocate. (*Id.*) Yang also asserted a lack of impartiality by the Committee Chair, Professor Murray. (*Id.*) Yang supported this assertion by noting that

8

Professor Murray "interrupted" Yang and his advocate more than seven times but interrupted Director Dzik and University witnesses once. (*Id.*) Vice Provost Lanyon wrote that this kind of scorekeeping is not sufficient to establish bias and that the record shows that Professor Murray's interruptions concerned moving the hearing along and enforcing agreed-upon timeframes. (*Id.*) Finally, Vice Provost Lanyon was unconvinced by Yang's assertion that Yang did not have sufficient time to present his arguments because Yang and the University agreed on the amount of time each party would have to present their case at a pre-hearing conference. (*Id.*) Put simply, Vice Provost Lanyon found no merit to any of the alleged procedural errors. (*Id.*)

Yang also argued that the Campus Committee on Student Behavior's decision was based on a lack of substantial information. (*Id.* at 5–6.) Vice Provost Lanyon rejected this ground for appeal as a request "to substitute [his] judgment for that of the Panel's." (*Id.* at 6.) Because the arguments supporting Yang's assertion that the decision was not based on substantial information were also made at the hearing, Vice Provost Lanyon concluded that Yang had a full and fair opportunity to present his position to the Campus Committee on Student Behavior. (*Id.*)

Finally, Vice Provost Lanyon rejected Yang's assertion that the outcome of the hearing (i.e., expulsion from the University) was grossly disproportionate to the conduct. (*Id.* at 6–7.) Yang argued that the reason provided for the expulsion—that Yang's conduct had destroyed trust between him and the University—was not an appropriate consideration. (*Id.*) Vice Provost Lanyon disagreed, pointing out that the written preliminary exam is an important step in the process of earning a Ph.D. and that Yang's

9

conduct violated the trust placed in students to complete an un-proctored exam using only their own work. (*Id.*) Vice Provost Lanyon found it appropriate to designate a no-tolerance policy for such conduct and to characterize it as "serious scholastic dishonesty" under the *Student Conduct Code*. (*Id.*)

Vice Provost Lanyon issued his decision on January 7, 2025, upholding the Campus Committee on Student Behavior's finding of responsibility and Yang's resulting expulsion from the University. (*Id.*)

Yang sued the University the next day. (Compl. (Doc. 1).) He later amended his complaint to drop the University as a defendant and to add Professor Neprash, Director Dzik, Professor Murray, and Vice Provost Lanyon as defendants, and in his amended complaint he asserts a single claim for violation of his right to due process pursuant to 42 U.S.C. § 1983. (Am. Compl. (Doc. 10).)

The University Officials now move to dismiss.

## LEGAL STANDARD

As the Court well knows, it must dismiss an action if it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3). In determining whether a court has subject-matter jurisdiction, it "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. U.S.*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

A complaint must be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, the complaint must include sufficient factual allegations to provide the grounds on which the

claims rests." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acts alleged must be enough to raise a right to relief above the speculative level and must state a claim to relief that is plausible on its face." *Id.* (internal quotation marks and citation omitted).

Although the Court "must take all of the factual allegation in the compliant as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A "court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility,'" and it must therefore be dismissed. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

## ARGUMENT

Yang's amended complaint against the University Officials in their official capacity is barred by the doctrine of sovereign immunity. Moreover, in seeking an injunction reinstating his studentship, expunging his disciplinary record, and allowing him to complete his Ph.D. program, Yang seeks to challenge the University's discretionary decision to expel him—a challenge that he must first lodge with the

11

Minnesota Court of Appeals. Finally, even had the Court authority to consider Yang's complaint, it would have to conclude that Yang's complaint, on its face, fails to state a claim upon which relief can be granted. The Court should therefore dismiss with prejudice Yang's complaint. The Court should therefore dismiss with prejudice Yang's Amended Complaint.

**1.     The Eleventh Amendment bars Yang's claim for money damages.**

Yang claims that the University Officials, acting in their official and individual capacities, violated his right to due process under § 1983, and he seeks $4,510,000 in damages. (Am. Compl. (Doc. 10) ¶ 36.) The Eleventh Amendment bars this claim.

The Eleventh Amendment "provides that states and their agencies are immune from suit in federal court, unless the state has consented to be sued, or Congress has abrogated the state's immunity by some express statutory provision." *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 813 (D. Minn. 2015). It is beyond dispute that the University is an arm of the State of Minnesota. *Humenansky v. Regents of Univ. of Minn.*, 152 F.3d 822, 824 (8th Cir. 1998) (affirming summary judgment for Regents of the University of Minnesota because the "University" is "an instrumentality of the state"); *Regents of Univ. of Minn. v. Raygor*, 620 N.W.2d 680, 681, 683 (Minn. 2001) (finding that "the University is an 'arm' of the State of Minnesota" entitled to sovereign immunity). "[T]he Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially for the recovery of money from the state." *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996).

Importantly, Yang has not alleged that Congress abrogated the University's immunity or that the University in any way has consented to this action—and in fact it has not done so. *See Mulla v. Univ. of Minn.*, Case No. 20-cv-931 (SRN/LIB), 2021 WL 603774, at *13 (D. Minn. Feb. 16, 2021) (holding that the University has not waived its sovereign immunity with respect to due process claims).

Moreover, Section 1983 imposes liability on any "person" who deprives another of constitutional rights. *See* 42 U.S.C. § 1983. It is well established that "neither a State nor its officials acting in their official capacities[2] are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 71 (1989).

In short, the law is clear that the Eleventh Amendment immunizes the University Officials from suit in federal court for money damages. *Treleven*, 73 F.3d at 819. To the extent that Yang seeks money damages, his claim must be dismissed.

**2.   Yang has failed to state a claim that he was deprived due process.**

To the extent that Yang seeks prospective injunctive relief from the University Officials, his amended complaint must be dismissed because he has not exhausted his administrative remedies before bringing his dispute to this Court. Moreover, his complaint on its face demonstrates that he received extensive process in connection with

---

[2] To the extent that Yang alleges that the University Officials acted against him in their individual capacities, his amended complaint is wholly bereft of supportive allegations. Nowhere in his complaint does Yang allege that any of the University Officials took any actions whatsoever, let along in service of depriving Yang of due process, in their individual (or rather, outside of their official) capacities.

13

the University's decision to expel him. As such, his amended complaint must be dismissed.

>    a.   <u>Yang's amended complaint must be dismissed because he did not exhaust his administrative remedies.</u>

Yang has not alleged, because he cannot allege, that he exhausted his administrative remedies before filing suit here, and this failure is fatal for his amended complaint.

Although plaintiffs are generally not required to exhaust state remedies as a prerequisite to bringing an action under § 1983, the U.S. Court of Appeals for the Eighth Circuit has recognized an exception to this rule. *Keating v. Neb. Pub. Power Dist.*, 562 F.3d 923, 929 (8th Cir. 2009) (citing *Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000)). Plaintiffs asserting § 1983 claims alleging procedural due process violations, as Yang does here, must exhaust all state remedies, without exception, before judicial relief can be sought in federal court. *Wax 'n Works*, 213 F.3d at 1019 ("[A] litigant asserting a deprivation of procedural due process must exhaust remedies before such allegation states a claim under § 1983." (citations omitted)). The Eighth Circuit has strictly applied the exhaustion rule without discussion of exceptions or excuses. *See Hopkins v. City of Bloomington*, 774 F.3d 490, 492–93 (8th Cir. 2014) (because the plaintiff voluntarily ceased pursuing available state remedies, she waived her ability to pursue a procedural due process claim); *Crooks v. Lynch*, 557 F.3d 846, 848–49 (8th Cir. 2009) (holding that plaintiff had not exhausted state remedies where appeal from state agency in state court was pending).

Here, Yang has not availed himself of his right to challenge his dismissal by way of a petition for a writ of certiorari to the Minnesota Court of Appeals, precluding the exercise of subject-matter jurisdiction by this Court over his due process claim. "[T]he only method available for review of a university decision" is by writ of certiorari to the Minnesota Court of Appeals. *Shaw v. Bd. of Regents of Univ. Minn.*, 594 N.W.2d 187, 191 (Minn. Ct. App. 1999); *see also Zweber v. Credit River Twp.*, 882 N.W.2d 605, 610 (Minn. 2016) (holding that when an action challenges a quasi-judicial decision, the "exclusive method of review is by certiorari").

Certiorari review addresses "questions affecting the regularity of the proceedings and . . . whether the determination was arbitrary, oppressive, unreasonable, fraudulent, made under an erroneous theory of law, or without any evidence to support it." *Chronopoulos v. Univ. of Minn.*, 520 N.W.2d 437, 441 (Minn. Ct. App. 1994). If Yang wants to challenge the adequacy of the University's process, he was required to do so by writ of certiorari at the Minnesota Court of Appeals. *See Shaw*, 594 N.W.2d at 191.

Consequently, this Court does not have subject-matter jurisdiction over Yang's due process claim and must dismiss his complaint.

    b.    <u>Yang's amended complaint must be dismissed because he has not stated a claim that he was deprived due process.</u>

Yang asserts that the University Officials deprived him of due process in the proceedings to dismiss him from the University. The amended complaint, however, makes clear that Yang received at least as much process as he was due under the U.S. Constitution.

Yang's amended complaint fails to show that his right to due process was violated. At the forefront, the Fourteenth Amendment does not provide for a "constitutional right to an education," and "the Due Process Clause does not protect against expulsions" from public universities. *Goss v. Lopez*, 419 U.S. 565, 572 (1975). Academic dismissals—like the one at issue here, where Yang was dismissed for scholastic dishonesty—require less process than disciplinary dismissals. *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978). This holding reflects deference to the "judgments of educators," especially as a student "advances through the varying regimes of the education system, and the instruction becomes more individualized and more specialized." *Id.* Where a disciplinary dismissal requires notice and an opportunity to be heard, an academic dismissal requires notice and a "careful and deliberate" standard. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 595 (8th Cir. 2007).

Here, there is no question based on the allegations in Yang's amended complaint that he received enough due process to satisfy either standard. Yang received a full hearing, where he was represented by an advocate, had the opportunity to cross-examine all witnesses against him, and presented several exhibits. (Am. Compl. (Doc. 10-7) Ex. 7.) By the time of the hearing, he had ample notice of the scholastic dishonesty allegations against him, through a meeting with the Office for Community Standards that shared the concerns of the Grading Committee and considered Yang's written response to the allegations. (*Id.*) Yang was also able to appeal the decision to the University's Vice Provost and had further opportunity to challenge it by way of writ of certiorari to the

Minnesota Court of Appeals. There can be no question that he was afforded due process in the dismissal process.

Therefore, he has failed to state a claim that he was deprived due process, and his amended complaint must be dismissed.

**3.     Qualified immunity bars Yang's amended complaint against the University Officials.**

Finally, Yang's amended complaint is barred because of the University Officials' qualified immunity. Throughout his Amended Complaint, Yang seeks to impose personal liability on the University Officials; however, qualified immunity shields government officials acting in their individual capacity unless their "conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotation omitted).

Therefore, to overcome qualified immunity Yang must satisfy two inquiries: (1) he must show that the University Officials' conduct violated his rights and (2) he must show that the right in question was "clearly established at the time of the violation."

*Hemminghaus v. Mo.*, 756 F.3d 1100, 1110 (8th Cir. 2014) (first quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam) (internal quotation omitted)).

This means that even if the Court concludes that Yang has sufficiently pleaded that his due process rights were violated, the University Officials are entitled to qualified immunity because the particular right at issue was not clearly established at the time of the alleged violation. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Chambers v. Pennycook*, 641 F.3d 898, 908 (8th Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal quotations and alterations omitted). The correct question is "whether the law at the time of the events in question gave the [officials] 'fair warning' that their conduct was unconstitutional." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Precedent determines whether there was fair warning. *Dimock v. City of Brooklyn Ctr.*, 124 F.4th 544, 553 (8th Cir. 2024).

Here, the University Officials are unaware of any case that stands for the proposition that a plaintiff's due process rights are violated when he is expelled for scholastic dishonesty following an investigation, a hearing before a panel, and an independent appeal. Absent precedent to this effect, the individual Defendants would have no way to know that it was clearly established that their actions were a violation of Yang's right to due process. Accordingly, Yang's amended complaint is barred by qualified immunity.

## CONCLUSION

For the foregoing reasons, the University Officials respectfully ask the Court to dismiss with prejudice Yang's amended complaint.

Dated: March 18, 2025

DOUGLAS R. PETERSON
General Counsel
University of Minnesota

By: s/ Carrie Ryan Gallia
Carrie Ryan Gallia (#0390479)
Senior Associate General Counsel
360 McNamara Alumni Center
200 Oak Street S.E.
Minneapolis, MN 55455-2006
ryang001@umn.edu
(612) 624-4100

*Attorneys for Defendants*