UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Haishan Yang, | Civil No. 25-cv-00089-JMB-SGE |
| Plaintiff, | |
| v. | **DECLARATION OF HAISHAN YANG IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Hannah Neprash, Scott Lanyon, JaneAnne Murray, and Sharon Dzik, in their individual and official capacities, | |
| Defendants. | |

---

1. I filed and served a petition for a writ of certiorari on March 3, 2025, and served the issued writ on March 5, 2025, to opposing counsel, Ms. Ryan Galiias. However, in her Memorandum of Law, she wrote: "*Here, Yang has not availed himself of his right to challenge his dismissal by way of a petition for a writ of certiorari to the Minnesota Court of Appeals, precluding the exercise of subject-matter jurisdiction by this Court over his due process claim.*" (Doc. No. 29 at 14.)

2. The above statement is false. I did, in fact, file a petition for a writ of certiorari—and Ms. Ryan Galiias was aware of this two weeks before she submitted her memorandum of law in this case. An email confirms that Ms. Ryan Galiias received the filing on March 3 (Exhibit 1), and Exhibit 2 shows that I served the issued writ of certiorari on the University of Minnesota ("the

University") on March 5.

3. Judge Laurie Miller in Minnesota District Court also appeared to be confused on this point. In a separate state court case over which she presides, during a hearing on March 21, 2025, Judge Miller asked Ms. Ryan Galiias, "So it has passed the deadline for the writ?" to which Ms. Ryan Galiias responded, "I am representing that case."

4. Importantly, the University's decision to expel me was a disciplinary dismissal—not an academic dismissal. Academic dismissal typically involves poor academic performance based on academic judgment. In my case, the grading professors had not yet graded my exam, but I was accused of violating the Student Conduct Code during the exam.

5. The University's policy explicitly prohibits the use of generative AI for grading and disciplinary decision-making. In addition, the policy also states: "The University of Minnesota does not endorse any AI detection tool at the moment, and it is NOT recommended to use AI tools to scan student work." Therefore, what Defendant Neprash did—generating a ChatGPT response and submitting my exam answer to an AI detector—violated University policy and exceeded the scope of her official duties, regardless of whether she altered the evidence or not. (See Exhibit 3 and Exhibit 4[1].)[2]

---

[1] Exhibit 3 and 4 are publicly available documents, which is admissible in this declaration pursuant to Minn. R. Civ. P. 56.05 and Minn. R. Evid. 201,
[2] Noticeably, the university deleted this specific prohibition from its website after I filed a complaint with the Minnesota Office of Administrative Hearings on March 17, 2025.

6. During the hearing, the University introduced two prejudicial letters. One of them was from Associate Dean Elizabeth Wattenberg, who advocated for my expulsion if I were found responsible for scholastic dishonesty. First, Wattenberg should not have had access to my disciplinary record. She was not a grader of the exam, and was not assigned any official role in the hearing. Nevertheless, during the hearing, Defendant Neprash cited Wattenberg's letter as the basis for expulsion. (See Doc. No. 10-6 at 244[3].)

*231 00:25:47.080 --> 00:25:57.549*

*Sharon Dzik: Right. Do you think it's fair that someone that you suspect highly of, you know, having scholastic dishonesty would get the same opportunity as someone who honestly, just didn't pass.*
*232*
*00:25:59.760 --> 00:26:14.290*
*Hannah T Neprash: I don't, and I would refer you to the letter that the associate Dean from the School of Public Health submitted, where she talks much more eloquently about the importance of integrity for students who are completing a Phd. And.*

7. During the hearing, University representative Sharon Dzik read the letter nearly in its entirety. (See Doc. No. 10-6 at 253. A copy of the letter is attached as Exhibit 5.)

8. As Associate Dean, Wattenberg wields substantial institutional authority, including writing recommendation letters, participating in tenure decisions, and influencing

---

[3] Pursuant to Minnesota Rule of Civil Procedure 10.03, a written instrument that is an exhibit to a pleading or filed document is considered part of the record and may be cited for purposes of clarifying or correcting factual assertions.

hiring and academic appointments. She holds administrative oversight within the School of Public Health and maintains professional influence across related units. One panel member was a professor from the School of Public Health, directly within her administrative purview. The panel also included an administrator from the College of Pharmacy and a medical school student—both of whom, due to their institutional affiliations and comparatively junior roles within the University, may have felt compelled to align with the judgment of a high-ranking university official. Wattenberg's active advocacy for Plaintiff's expulsion created an inherent conflict of interest, placing undue pressure on the panel and compromising their ability to render an impartial decision. This structural imbalance undermined the integrity of the disciplinary process and violated Plaintiff's right to a neutral and unbiased tribunal.

9. The second prejudicial letter was from Professor Susan Mason. Professor Mason suspected that I had used AI on a homework assignment and reported it to the University in 2023. However, just a few days later, she withdrew the charge, and I was ultimately found not responsible. Despite this, the University relied on this dismissed case to support a finding of guilt in a new case. The University's reliance on a previously dismissed allegation to imply a repeated offense violates basic due process protections and evidentiary fairness. Courts have long recognized that relying on unsubstantiated prior claims to infer present guilt constitutes improper use of propensity evidence and prejudices the accused. (See

Doc. No. 10-6 at 17–18. The letter is attached as Exhibit 6.)

10. The appeal decision letter (see Doc. No. 10-7 at 4) states: "First, there is nothing in the record to suggest any motivation for Dr. Neprash to act contrary to the interests of Dr. Yang." This is not true. I had a conflict of interest with both Defendant Neprash and Professor Nikpay, who was on the grading committee. My academic advisor, Bryan Dowd and I mentioned this conflict both during the hearing and in appeal letters. My academic advisor, Professor Bryan Dow, testified to this fact. (See Doc. No. 10-6 at 222–223.)

*16*
*00:02:23.280 --> 00:02:40.230*
*Roxanne S Krietzman: Sure. Sure there's a file listed in our box folder that has a letter from you from last September, giving your support to Haishan in a previous incident. Can you explain why this incident is relevant to our hearing today?*
*17*
*00:02:40.860 --> 00:02:46.090*
*Bryan Dowd: Well, it's relevant because some of the same people are involved in both incidents.*
*18*
*00:02:47.460 --> 00:02:49.549*
*Roxanne S Krietzman: Okay. Can you say who those people are?*
*19*
*00:02:50.716 --> 00:03:07.699*
*Bryan Dowd: Well, Ezra Hannah Saye[4], I think, would be one those would be the main people. Although the previous incident also involved the director of graduate studies at that time.*
*20*
*00:03:08.251 --> 00:03:13.989*
*Bryan Dowd: Donna Mcalpine, who, I believe, later resigned and was replaced by Karen Koontz.*

---

[4] Here, Dowd means Ezra Golberstein, Hannah Neprash and Sayeh Nikpay.

11. The incident refers to an employment dispute involving one of the grading faculty, Professor Sayeh Nikpay[5]. She had an authorship dispute with me in February 2023, and one week later after the dispute, she reported me to the program director. Shortly thereafter, the director revoked my guaranteed funding. Eventually, the University settled this employment case with me and offered an apology letter. In a letter mentioned in above conversation (Exhibit 7[6]), Dowd wrote: "*My concern is that they are not separate, but may have been part of a coordinated effort to force Haishan to leave HPM's Ph.D. program.*"

12. Additionally, in a letter that Professor Bryan Dowd sent to the Provost's Office to appeal the decision to expel me, he wrote:

13. "*This is not the first attempt to expel Dr. Yang from our program. An earlier attempt resulted in the Division writing Dr. Yang a letter of apology and the University's attorneys requesting an assurance from Dr. Yang that he would not sue the University. In over four decades in our Division, I have never seen this level of animosity directed at a student. I have no explanation for that animosity.*" (Exhibit 8)

14. In addition, Defendant Neprash made a false statement during the hearing in an attempt to conceal her prior conflict of interest. During the hearing, she made the

---

[5] Nikpay did not participate in the grading in the end. Golberstein said that she was busy in an international trip.
[6] Dowd sent this letter to the Division Head on Mid of 2023.

following statement (Doc. No. 10-6 at 241–242):

*196*
*00:21:25.710 --> 00:21:30.130*
*Sharon Dzik: the. It was mentioned that there was a strained relationship with you*
*197*
*00:21:30.280 --> 00:21:32.139*
*Sharon Dzik: is, can you comment on that?*
*…….*
*204*
*00:21:58.060 --> 00:22:12.655*
*Hannah T Neprash: was maybe a little unusual in that it didn't come directly to me. It went through Ezra and was passed to me, and I responded to it by providing extremely detailed answers about why I graded how I graded*
*205*
*00:22:13.030 --> 00:22:14.570*
*Sharon Dzik: Paper. Are you referring to.*
*206*
*00:22:14.570 --> 00:22:20.200*
*Hannah T Neprash: We're referring to the final exam from my from my course, Hi, Hi Shawn received*
*207*
*00:22:20.700 --> 00:22:31.683*
*Hannah T Neprash: A. B in that class which was the lowest grade that that anybody got in that class. So again, grading challenges, I'm sure anyone who teaches has gotten these before.*

15. However, in an email she sent to me on January 17, 2023, she wrote (Exhibit 9):

16. *I am copying Dr. Ezra Golberstein, the head of our economics area of emphasis within the HSRP&A program - so that he is aware of this situation. I will not be responding to your itemized questions. Again, I suggest that you review the exam rubric and the course materials, since everything covered in the exam came*

*directly from course lectures and readings.*

17. Defendant Neprash also altered the ChatGPT-generated answer to make it more closely resemble my exam response. During the hearing, she denied making any alterations multiple times.

18. Vice Provost Scott Lanyon stated in his appeal decision letter: "*Dr. Yang, had he believed Dr. Neprash was biased against him, and could have challenged her inclusion on the panel that reviewed his prelim exam, but there is nothing in the record suggesting he did so.*" (see Doc. No. 10-7 at 4) This reflects a misunderstanding of how the preliminary exam works in my program. Students cannot choose or change graders—at least, it has not occurred in the past few years to my knowledge—as the grading members have remained fixed for years. I did not know Defendant Neprash would be on the committee until summer 2024, because she was on sabbatical prior, when Golberstein mentioned it during office hours. By then, I had already spent considerable time preparing and did not want to switch tracks just to avoid graders.

19. There were five faculty members on the grading committee: Professors Ezra Golberstein, Hannah Neprash, Sayeh Nikpay, Peter Huckfeldt, and Caitlin Carroll. Professor Nikpay ultimately did not grade the exam. Therefore, only four professors—Golberstein, Neprash, Huckfeldt, and Carroll—submitted their names in the report to the University alleging scholarly dishonesty.

20. Professors Golberstein and Neprash appeared at the hearing and were questioned by my student advocate, Krietzman. However, Professors Huckfeldt and Carroll did not attend the hearing and instead submitted written testimony—contained in Exhibits 10 and 11—asserting that the ChatGPT answer was highly similar to mine. As a result, I was not afforded the opportunity to challenge Huckfeldt and Carroll—two of the faculty members whose accusations formed the basis of the disciplinary action against me. In fact, prior to the prehearing conference at the University, I sent an email to Chair Murray requesting the presence of Professors Huckfeldt and Carroll to testify, and I also made multiple oral requests during the prehearing conference for these two professors to appear.

21. I was also denied the opportunity to challenge Wattenberg and Mason, whose prejudicial letters were cited as justification for the expulsion decision.

22. Importantly, each of the five professors wrote one question. At the end of the hearing, I was only required to answer three questions. I chose Questions 1, 3, and 4. The grading professors mostly suspected that I used AI on part of Question 4, based on the similarity between my exam answer and Neprash's ChatGPT-generated answer.

23. Professor Golberstein wrote Question 1, and for this question, none of the professors expressed concern about AI usage. Defendant Neprash wrote Question 2, which I did not answer. (See Doc. No. 10-6 at 58.)

*01:12:24.410 --> 01:12:27.400*

*Ezra Golberstein: Sure I wrote. Question one.*

*512 01:12:29.200 --> 01:12:34.314*

*Ezra Golberstein: question 2.  I can't even remember what the ordering of the questions. I have to go back and look*

*513 01:12:34.640 --> 01:12:41.309*

*Ezra Golberstein: but I can say question 3 was written by Caitlin Carroll. Question 4 was written by Peter Huckfelt.*

24. The grading professors only had concerns about Questions 3 and 4, which were written by Professors Carroll and Huckfeldt. Therefore, these two professors are the primary accusers. However, I was not given the opportunity to challenge either of them. In other words, the authors of the two questions not under suspicion appeared at the hearing to accuse me, while the authors of the two questions under suspicion were absent.

25. What is more telling is that the two professors with whom I had no prior conflict of interest did not participate in the hearing, while Golberstein and Neprash—who have documented prejudice—did participate and accused me. (See Doc. No. 10-6 at 222–223.)

26. The following conversation in Doc. No. 10-6 at 41 and 113 shows which answers, in specific questions, drew the grading professors' concern.

   *354*
   *00:51:21.250 --> 00:51:26.971*
   *Ezra Golberstein: So where, for his answers for question one and question 3 in the exam.*
   *355*
   *00:51:27.800 --> 00:51:33.160*
   *Ezra Golberstein: my initial read was that he actually seemed to use citations reasonably, appropriately.*
   *356*
   *00:51:33.270 --> 00:51:38.959*
   *Ezra Golberstein: Question 4 stood out, though he had cited only one paper, and that paper seemed*
   *357*
   *00:51:39.160 --> 00:51:50.289*
   *Ezra Golberstein: really irrelevant to his answer for that question so collectively, for those 4 reasons, I had suspicions about the potential for some sort of scholarly misconduct on the exam.*
   *358*
   *00:51:50.500 --> 00:51:56.430*
   *Ezra Golberstein: But although at that point I didn't have any specific ideas as to what nature of scholarly misconduct.*

   *Hannah T Neprash: And this is the result from question 4 of our prelim, where it assesses a probability at 89% for AI generated text. And this is this question. 4 is also the one where we find the most similarities. When we, when we compare the the text that High Sean submitted with the, with the output from Chatgpt*

27. In addition, Professors Carroll and Huckfeldt did not authorize Golberstein or Neprash to speak on these specific questions on their behalf, and Golberstein admitted he was not the "best person" to discuss Question 4. In other words, the

University deprived me of the fundamental right to challenge and confront the "best person" regarding Question 4, which was under suspicion. (See Doc. No. 10-6 at 80.)

> 723
> 01:33:48.452 --> 01:33:53.759
> Roxanne S Krietzman: What would be a standard answer for this question in your opinion.
> 724
> 01:33:56.824 --> 01:34:05.595
> Ezra Golberstein: So here I would actually note that the best person to speak to this would be
> Professor Huckfeld. Who's the one that actually wrote this question,
> 725
> 01:34:05.920 --> 01:34:06.560
> Roxanne S Krietzman: Okay.
>
> ( Doc. No. 10-6 at 114-115.)
> 48
> 00:07:09.869 --> 00:07:17.560
> Sharon Dzik: did the other faculty independently suspect AI? Do you know the answer to that
> you might not know. But do you know.
> 49
> 00:07:19.350 --> 00:07:23.769
> Hannah T Neprash: I don't feel like I can speak for them. I. The thing I can say is that

28. During the hearing, when Krietzman attempted to question Neprash about the generation of the ChatGPT content, University representative Dzik interrupted and blocked this critical line of questioning, further impairing my right to a fair hearing. Dzik proposed a breakout session, and she, Krietzman, and Hearing Chair

Murray left for approximately three minutes. This conversation was not recorded. They spent nearly three minutes in the breakout session, and neither I nor the panel members knew what was said there. In particular, what was the basis for prohibiting Krietzman from asking how Defendant Neprash generated the ChatGPT response? In other words, Chair Murray made an ex parte procedural decision.

29. According to University hearing procedures, there is no provision allowing the opposing party to interrupt during cross-examination, and the procedures require that the entire hearing be recorded. (Exhibit 12 at 9)

30. At the end of the hearing, Defendant Neprash cited "breach of trust" as the reason to expel me. This reason was later cited in both the hearing decision letter and the appeal decision letter as the basis for expulsion. However, "trust" is not listed as a reason for expulsion under the Student Conduct Code at the University (Exhibit 13). If a professor can decide whom to expel based on whom they trust more, they essentially have unlimited power to decide who to expel.

31. In the letter Dowd sent to the Provost's Office, he wrote: "*Expelling a student because of 'mistrust' on the part of the faculty seems radical, subjective, and arbitrary to me, and opens the door for abusive behavior on the part of the faculty.*" (Exhibit 8 at 2.)

32. Based on the testimony from Golberstein, it appears he gave much more lenient treatment to two other students, which served as an indicator that he "trusts" me less. During the hearing, Golberstein stated that over the course of his career, he had suspected two students of scholarly dishonesty. In one case, the student admitted to the misconduct, yet Golberstein did not even report the incident to the University. In the other case, the misconduct involved doctoral thesis writing—arguably more serious than Plaintiff's alleged conduct during an exam—but it did not result in expulsion. (See Doc. No. 10-6 at 53.)

33. The University also alleged that my exam answer was unusually long. However, I was not granted access to other students' exam responses, depriving me of the ability to meaningfully challenge that claim. Given that Defendant Neprash altered both the ChatGPT output and the AI detector's probability score, I have reason to believe the reported word counts for other students may have been altered as well.

34. The main evidence used against me was that 6.6% of my exam answer matched a ChatGPT-generated response. However, this raises serious concerns about the reliability of using ChatGPT outputs to evaluate student work. During the hearing, Krietzman submitted the exam questions to ChatGPT, and the generated response was completely different—even when compared to the unaltered version in Neprash's original ChatGPT log. (See Doc. No. 10-6 at 129–133.) I also tested this myself using ChatGPT, and even after trying ten times, I was unable to produce a single version similar to Neprash's.

35. In summary, my situation closely resembles Doe v. Purdue Univ., 928 F.3d 652, 663–64 (7th Cir. 2019), where the plaintiff was denied access to all the material evidence used by the university to reach its disciplinary decision. Similarly, I was denied access to nearly all of the evidence used to accuse me. Specifically:

    - Defendant Neprash's ChatGPT log was provided only at the last minute—during cross-examination and just minutes before the hearing's concluding remarks;
    - I was not given any comparative data from other students;
    - I was not provided with any explanation of how Defendant Neprash arrived at the 89% AI probability score.

    In effect, the University withheld nearly all of the evidence it used against me, aside from subjective impressions by the grading professors— based on the University's presentation slides (See Doc. No. 10-8 at 4, 6-16 and 18-21)[7]

36. My experience is likely even worse than Doe's, because the University used altered evidence against me, and I was not even allowed to see or question the professors who authored the exam questions under suspicion. Instead, the only faculty who appeared were those with clear conflicts of interest.

37. Lastly, this case is one of five related to the University's expulsion action in January 2025. These cases include:

---

[7] The evidence I was denied access to comprises nearly all of the 21 pages of the University's presentation slides.

    a. *Haishan Yang v. University of Minnesota*, OAH No. 25-0305-40725 (Minn. Office of Admin. Hearings, filed Mar. 17, 2025);

    b. *Haishan Yang v. The Regents of the University of Minnesota*, Civ. No. 27-CV-25-5506 (4th Dist. Ct. Minn.) (filed Mar. 31, 2025) (breach of contract, MGDPA, due process, MHRA, equal protection, emotional distress claims);

    c. *Haishan Yang v. Hannah Neprash*, Civ. No. 27-CV-24-19633 (4th Dist. Ct. Minn.) (first amended complaint filed Mar. 19, 2025) (defamation, fraudulent misrepresentation, abuse of process, tortious interference, negligent misrepresentation, emotional distress claims);

    d. *Matter of the University of Minnesota v. Haishan Yang*, No. A25-0342 (Minn. App. 2025) (writ of certiorari of University administrative action filed Mar. 3, 2025).

38. Given that new information or evidence may be discovered in other related proceedings that could support my arguments in this case, I respectfully request that, should the Court grant the motion to dismiss, it do so without prejudice.

List of Exhibit:

Exhibit 1 – Email Confirming Certiorari Petition Receipt

Exhibit 2 – Proof of Writ Service on University

Exhibit 3 – Policy Prohibiting AI in Discipline Decisions

Exhibit 4 – Policy Disavowing AI Detection Tools

Exhibit 5 – Wattenberg Letter Advocating Expulsion

Exhibit 6 – Mason Letter on Withdrawn AI Allegation

Exhibit 7 – Dowd Letter Alleging Coordinated Retaliation

Exhibit 8 – Dowd Appeal Letter to Provost

Exhibit 9 – Neprash Email Refusing Grading Questions

Exhibit 10 – Letter from Huckfeldt

Exhibit 11 – Letter from Carroll

Exhibit 12 – University Hearing Procedure Policy

Exhibit 13 –  Student Conduct Code (Excerpt)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: April 7, 2025                                          Haishan Yang

2136 Ford Parkway #5244,

Saint Paul, MN 55116

(435) 932-1198

Haishan1121@gmail.com