# UNIVERSITY OF MINNESOTA

**Twin Cities Campus**
*Office Building*

*Division of Epidemiology*
*& Community Health*
*School of Public Health*

*Suite 300 West Bank*
*1300 S. 2nd Street*
*Minneapolis, MN*
*55454-1015*

To Whom It May Concern:

On October 4th, 2023, my teaching assistant for PUBH 8341: Advanced Epidemiologic Methods: Concepts met with me to discuss grading for our first homework assignment. My TA brought up an answer in Haishan Yang's homework that seemed to have been generated by AI, shown below with the indicator of AI use highlighted:

> Homework question:
>
> **d. (15 points) Compare the answers to the observed results in part b to the true (counterfactual) results in part c. Explain the similarities and differences using your exchangeability answers in part a.**
>
> Haishan's answer:
>
> *Exchangeability is critical to derive unbiased estimates of causal effects. When exchangeability is achieved, the observed difference should be close to the counterfactual difference, indicating minimal bias. However, in strata where exchangeability is not met, observed differences might not represent true causal effects, suggesting potential confounding.*
>
> *In this dataset:*
> *In the overall sample, the slight difference between observed and counterfactual RDs might be due to non-exchangeability or other factors not considered.*
>
> *In the L=0 stratum, despite non-exchangeability, the observed and counterfactual RDs should ideally be close, but they aren't. This highlights potential confounding or other biases in this stratum.*
>
> *In the L=1 stratum, the perfect match between observed and counterfactual RDs reflects the achieved exchangeability, indicating that the observed outcomes provide an unbiased estimate of the true causal effect of the exposure"* ==re write it , make it more casual, like a foreign student write but no ai==

It seemed clear to my TA and me, and my co-instructor with whom I shared this information, that Haishan had used AI to generate this answer and had accidentally left either a note to himself or a prompt for AI in his answer.

I emailed Haishan to ask him to explain and we met over Zoom. I recorded the meeting and can provide it if helpful. I anticipated that, given the evidence, he would confess to using AI. However, Haishan denied using AI to answer the question. He said that he sometimes uses ChatGPT to check his English (and left a note to himself to do so), but that he had decided against it in this case. I asked him why he would want ChatGPT to rewrite his answer to be more casual—had he had a problem with people telling him his homework answers were too formal? He said that he meant he thought it was too long and he wanted ChatGPT to shorten it. I did not find this explanation convincing.

Haishan also sent an email with results of AI detectors saying that his answer was 100% human. I used several online AI detectors myself and found that half of them indicated his answer was 100% human, and the other half said his answer was 100% AI. I concluded that these tools were not reliable for assessing the use of AI.

I made a report to the Office of Community Standards (OCS). We ultimately decided to not pursue the charges as we did not believe we had enough evidence to meet the standard of preponderance of the evidence in this case and the infraction seemed relatively minor. In addition, although our syllabus made clear that homework should be done by the student individually, we did not have an explicit prohibition against using AI. OCS instead sent a warning letter.

Please feel free to contact me if you need additional information.

Best wishes,

*Susan M. Mason*

Susan M. Mason, PhD

Associate Professor

Division of Epidemiology and Community Health, School of Public Health