# UNIVERSITY OF MINNESOTA

*Twin Cities Campus*  *Division of Health Policy and Management*
*School of Public Health*

For U.S. Mail:
Mayo Mail Code 729
420 Delaware Street S.E.
Minneapolis, MN 55455

For Courier/Delivery Service:
516 Delaware Street S.E.
15-200 PWB
Minneapolis, MN  55455

612-624-6151
Fax: 612-624-2196
E-mail: hpm@umn.edu
http://www.hpm.umn.edu

I am writing regarding Dr. Haishan Yang.  Haishan has been accused of performing poorly as a research assistant (RA) working for Dr. Sayeh Nickpay and also with making offensive remarks to faculty members and his fellow students.  These accusations resulted in two letters written to Haishan by Dr. Donna McAlpine who was the Director of Graduate Studies (DGS) at the time these events occurred.

Haishan now is appealing those charges, and I support his appeal.  However, I also have two preferred outcomes related to the appeal process that are not specific to Haishan's case.  As I will explain, my own primary goal is not to exonerate Haishan, although I believe he should be exonerated.  The process by which the two charges were leveled against Haishan and the subsequent penalties assessed against are an embarrassment to the Division of Health Policy and Management (HPM) where I have spent the last 43 years.  So my own primary goal is to make sure that process never again occurs in HPM.  My second goal is to ensure that no breeches of professional ethics occurred in the prosecution of Haishan.

I acknowledge and appreciate the fact that several important steps have been taken by the Division to correct the errors that were made in Haishan's case.  HPM has proposed to restore Haishan's offer of financial support; Dr. McAlpine has been replaced by Dr. Karen Kuntz as DGS; and the process for dealing with complaints regarding diversity, equity, and inclusion (DEI) has been moved from HPM to the School level.  These are important steps, but the process that resulted in the charges and penalties occurred entirely within HPM and there are further steps that can and should take place within HPM.

To salvage the Division's reputation for fairness and respect for its students, the two letters sent to Haishan by Dr. McAlpine need to be withdrawn.  There must be no record of them in Haishan's file or anywhere else.  They must be treated as though they never existed.  Again, the reason is not that Haishan is innocent of the charges.  I was not present for any of the events leading to the letters, so I don't have first-hand evidence about Haishan's work as an RA or his allegedly offensive remarks.  I have read his account of the events and I believe he makes a strong case for his innocence, but I want the letters withdrawn for the following reasons.

Regarding his poor performance as an RA, HPM asserts that Haishan's interactions with Sayeh "aligned with policy."  I am unaware of any such formal policy, and it seems that Haishan had no access to such a policy.  Haishan never was asked for his side of the story.  He had to provide his perspective after the fact through unsolicited responses in which neither Sayeh nor Donna showed any apparent interest.  Thankfully, an objective review by HPM resulted in an offer to restore Haishan's funding, but the poor performance letter remains in his file despite the fact that Haishan now has multiple offers from faculty who want him to work as an RA on their projects.  Hopefully, the appeals process will agree that the process for dealing with the charge of

1

poor performance; Haishan's defense against those charges; and his performance as an RA for faculty members throughout the Academic Health Center other than Sayeh, justifies removal of the letter.

Regarding the charge of offensive remarks, here are the facts. In her letter to Haishan of May 10th, 2023, Donna states: "In both of these roles (DGS and course instructor), I have heard multiple reports that your interactions with peers and faculty, both in and outside of the classroom, have contributed to a climate disparaging of women, particularly women who are Black. Indeed, the Anti-Racism Practice Committee, which monitors the bias reporting tool within the Division, has received multiple reports of bias related to your behaviors." Although Donna offered to meet with Haishan and did so, she never provided any details about who was offended or what Haishan had said. Nor was there any indication that the purpose of any meeting was to give Haishan the opportunity to meet with his accusers or to learn what he said that was offensive and why it was offensive, or for Haishan to be given the opportunity to apologize if appropriate. Instead, she suggested that he reflect on his experience.   This looks a lot like asking the accused to guess what crime he has committed.  It also looks a lot like anonymous character assassination, which never should happen.  As I have outlined in previous emails, anonymity may be appropriate when the accused person has a power advantage over the accuser, e.g., a student accusing a faculty member of bias.  But that is not the case when a faculty member or a fellow student accuses a student of bias, as in Haishan's case. Again, Haishan was never asked for his side of the story or given the opportunity meet with his accusers and set things straight. Donna served as prosecutor, judge, and jury. No educated person should want such absolute power because, as Lord Acton reminds us, absolute power corrupts absolutely.  Thus, the process alone justifies removal of Donna's bias-related letter from Haishan's file.  If his accusers want to file a complaint through the new (to our Division) SPH process, they are perfectly free to do so.  Hopefully, the School's process will limit anonymity protections to cases where it is appropriate to do so.

The issues of poor performance and bias are easily resolve within HPM where the problems originated.  Simply rescind the two letters.  My second major issue involves a potential breach of professional ethics, and is not so easily resolved.  Up to this point, the issues of poor performance and bias have been treated as separate issues.  My concern is that they are not separate, but may have been part of a coordinated effort to force Haishan to leave HPM's Ph.D. program.  I will pose a hypothetical scenario regarding the chain of events and what I would like is an iron-clad guarantee from HPM that there is not a grain of truth in my hypothetical.

The order of Donna's letters to Haishan suggest that the poor performance issue arose first, followed by, and independent of, the issue of offensive remarks.  My hypothetical scenario is that the following chain of events is what actually occurred.

1. Donna had personal experience and reports from others to suggest that Haishan harbored racial and gender bias, as evidence by remarks that others found offensive.
2. She and perhaps other HPM faculty, as well, considered these remarks serious enough to warrant his expulsion from the HPM Ph.D. program.  For example, I have heard that the economists in HPM have agreed en masse to refuse to serve on Haishan's dissertation committee.

2

3. Donna decided to expedite Haishan's exit from the program by withdrawing his funding guarantee, but she couldn't do that on the basis of the bias issue. She needed a poor performance report.
4. Sayeh agreed to elevate her previous disagreements with Haishan over publication authorship and perhaps other issues into a general report of poor performance.
5. Donna used that report to withdraw Haishan's funding guarantee.

HPM notes that there was a "… very compressed time frame during which performance concerns were explicitly articulated by Drs. Nikpay and McAlpine in writing and in meetings with the student (Haishan) and (we) do not believe that the duration and degree of performance concerns documented rise to the level of severity to warrant the retraction of Haishan's funding guarantee." My hypothetical scenario provides an explanation for that "very compressed time frame."

If my hypothetical scenario is what actually happened, then I consider that a serious violation of professional ethics. You cannot tailor the evidence to produce a desired outcome. And in Haishan's case, the HPM-level process that produced Donna's letter regarding offensive behavior was so flawed that HPM subsequently closed its internal process for dealing with reports of bias and now sends those complaints up to the School level.

I am asking for HPM to investigate what actually happened in Haishan's case and to assure me that my hypothetical scenario is entirely false. In the absence of that assurance, I want HPM to take whatever actions are appropriate in order to protect the Division and its students from anything like this ever happening again.

I care about what happens to Haishan. He is an exceptional student and a highly valued colleague elsewhere in the Academic Health Center. He was born and raised in China, received his Masters in Economics in Hungary, and his Ph.D. in Economics in Utah. None of that would have prepared him to deal with the DEI environment he encountered in HPM. Instead of trying to help him understand his new environment, I assert that HPM tried to throw him out of our Ph.D. program.

I also care about HPM and its degree programs. Episodes like Haishan's cannot be kept under wraps. Students, prospective students, and our alumni talk to each other and their opinions about HPM are not entirely within our control. In order to protect HPM's reputation I recommend that HPM rescind Donna's two letters, issue a formal apology to Haishan for the process that produced them, and investigate that process for possible violation of professional ethics.

Thank you for allowing me to offer my perspective.

Bryan E. Dowd, Ph.D.
Professor