# UNIVERSITY OF MINNESOTA

*Twin Cities Campus*  *Division of Health Policy and Management*
*School of Public Health*

For U.S. Mail:
Mayo Mail Code 729
420 Delaware Street S.E.
Minneapolis, MN 55455

For Courier/Delivery Service:
516 Delaware Street S.E.
15-200 PWB
Minneapolis, MN  55455

612-624-6151
Fax: 612-624-2196
E-mail:  hpm@umn.edu
http://www.hpm.umn.edu

December 8, 2024

Dear Appellate Officer:

I am writing in support of Dr. Haishan Yang's appeal regarding the University's decision to find him guilty of scholastic dishonesty and expel him from the University. According to Student Conduct Code Procedure -- the appeal needs to be a written submission and can be submitted by the appellant or their advisor. I am aware that Dr. Yang is drafting an appeal. But as his advisor, I would also submit this letter to you as a supplement to Dr. Yang's own appeal.

I am in my forty-fifth year as a member of the University of Minnesota faculty (minus a year's sabbatical at the University of North Carolina at Chapel Hill during the 1988-1989 academic year).  I have a Bachelor of Architecture from the Georgia Institute of Technology, an M.S. in urban administration from Georgia State University, and a Ph.D. in public policy analysis from the University of Pennsylvania.  I currently teach econometrics and co-teach Writing for Research with Dr. Karen Kuntz and I chair the Methods Preliminary Exam committee in our Division.  I also served as Director of Graduate Studies for our M.S. and Ph.D. programs from 1991 to 2007.  I have known Dr. Yang since he enrolled in Writing for Research in spring semester, 2023.  I have been his academic advisor since March of 2023.

Dr. Yang is accused of using ChatGPT to answer questions on his preliminary exam in our Division.  My support for Dr. Yang's appeal is based on the lack of convincing evidence that he is guilty.

1. I am not an expert on the technical aspects of ChatGPT or any other artificial intelligence tool, but having taught econometrics for over 40 years, I understand the problem of <u>omitted variable bias</u>.  ChatGPT gets its information on economic issues from the existing literature and the student is expected to do the same, supplemented by class notes.  If one does not carefully control for the content of the existing literature – a nearly impossible task – then one will overestimate the similarity of the student's answer and ChatGPT.  If I were the judge, I would need extensive and exact correspondence between the student's answer and ChatGPT to be convinced that the student copied information from ChatGPT.  Absent that evidence, I would conclude that the student and ChatGPT drew from the same source material and there was no scholastic dishonesty.

2. During the process of this inquiry, I have learned that if one submits the same question to ChatGPT multiple times, one will receive different answers.  Therein lies the problem.  If I were given the task of determining if a student used ChatGPT to answer a question, I

would allow myself only one submission of the exam question to ChatGPT, and *no part of the student's answer,* since that would bias the finding against the student. The answer returned by ChatGPT would have to meet the criteria of extensive and exact correspondence in order for me to consider the student guilty. The faculty who accused Dr. Yang of scholastic dishonesty do not seem to have followed these rules.

Inconsistent responses from ChatGPT makes it very unlikely the investigator will find such correspondence in only one attempt and also makes it very difficult to replicate that finding on a second attempt. More information on this point can be found in a blog post written by Timothy McAdoo, a member of the American Psychological Association style team (https://apastyle.apa.org/blog/how-to-cite-chatgpt). Mr. McAdoo writes about the difficulty of citing ChatGPT, due to inconsistent responses, but the same replicability problem makes it difficult to replicate correspondence between ChatGPT and the student's answer.

In my econometrics class, I allow the students to use any material they want to answer my questions, including ChatGPT, but I warn them that much of the existing econometrics literature that finds its way into ChatGPT is outdated or simply wrong.

3. Dr. Yang's accusers have raised other points regarding his answers to the preliminary examination question. I believe these points have been accurately addressed in Dr. Yang's appeal letter. I would add only that ours is a multidisciplinary doctoral program. Our students are required to take courses in sociology, health policy, qualitative and quantitative methods, and other topics in addition to economics. In my opinion, it would be not only expected, but desirable, for a student to draw on multiple disciplinary perspectives when answering preliminary exam questions in any of our areas of emphasis. Therefore, it is not solely up to these four accusing faculty members to determine what was or what should have been taught for the exam.

I would also support Dr. Yang's appeal because the recommended punishment was grossly disproportionate to the alleged offense. The Campus Committee on Student Behavior decision letter states that "continuing in the program would require trust." I find this statement problematic. Many years ago, I encountered an instance, of two students collaborating on an econometrics exam. In that case, I gave the students an opportunity to retake a different version of the exam. One student chose to leave the program. The other is a tenured professor at a major research university. *Expelling* a student because of "mistrust" on the part of the faculty seems radical, subjective, and arbitrary to me, and opens the door for abusive behavior on the part of the faculty.

I have taught and advised hundreds of students in our Division of Health Policy and Management over the years. Dr. Yang is the best-read student I have encountered in my time on the University of Minnesota faculty. He has read widely from economics, sociology, political science, world history, etc., and is able and anxious to discuss all those topics at great length. I wish more of our doctoral students were like that. He also has a stellar academic record. His

2

doctoral dissertation in economics consisted of three papers. Those papers dealt with the economic impact of hurricanes on housing rental and purchase prices and migration patterns, with emphasis on racial disparities. One of those papers has received a "revise and resubmit" decision at *Journal of Urban Economics*. Dr. Yang also has served as a research assistant for multiple faculty across three schools at UMN. Those RA-ships have resulted in several manuscripts with Dr. Yang as first author or co-author. I have listed the professors and publications at the end of this letter. He currently is writing on paper on an important affordability problem in health care, "Why do some people choose high cost health care providers?" There is virtually no existing literature on this topic, and I believe he will make a unique contribution to the field. Through my collaboration with him, he has undoubtedly earned my trust and the trust from his other supervisors.

My understanding is that this is the first case on that topic to go to a panel hearing. Your decision on Dr. Yang's case will provide an important precedent for future cases involving the use of AI on exams. This is not a time for hasty decisions or decisions based on questionable evidence. Instead, Dr. Yang's case presents an opportunity for reflection and refinement of the University's policy regarding the use of AI and how to determine its usage. I believe that our doctoral program and others throughout the University should consider the following questions:

1. What is being tested in your program's preliminary exams? If they are meant to test the student's ability to memorize lists of things, then why not take away the student's phone (and any other information-seeking device) and lock them in a room for a specified period of time to complete the exam? If the point is to test the student's ability to converse knowledgably about topic, why not give an oral exam? If the purpose is to test the student's ability to do original research, then why not use a research paper instead of an exam?

2. What is the objective in limiting the student's legitimate reference materials? Why, for example, would a professor allow a student to use Google Scholar but not ChatGPT?

3. What are the criteria for determining whether forbidden reference materials were used? How many tests of extensiveness and exactness of correspondence are allowed? Can those criteria pass common-sense tests of fairness and accuracy?

My final point concerns the treatment of Dr. Yang by faculty in our Division. This is not the first attempt to expel Dr. Yang from our program. An earlier attempt resulted in the Division writing Dr. Yang a letter of apology and University's attorneys requesting an assurance from Dr. Yang that he would not sue the University. In over four decades in our Division, I never have seen this level of animosity directed at a student. I have no explanation for that animosity.

Thank you for considering my perspectives on Dr. Yang's case.

3

Sincerely,

*Bryan E. Dowd*

Bryan E. Dowd, Ph.D.
Professor


Dr. Yang's Research Assistant appointments and resulting papers:

1. Amy L Gower, Medical School, April 2023 to May 2024.
   *Manuscript: Effective Ways to Promote the Human Papillomavirus vaccine for LGBT youth.*

2. Jesse Berman, School of Public Health, Summer 2023.
   *Manuscript:* Berman JD, Yang H, Tong D, Judd L, Tao Z, Bell JE. The Impacts of Drought Conditions on Ozone Air Pollution and Consequences for Regulatory Compliance.

3. Xiao Zang, School of Public Health, Summer 2023 to present.
   *Manuscript:* Haishan Yang, Rena Patel, Eric Hurwitz, Jerrod Anzalone, Cara Varley, Bohdan Nosyk, Xiao Zang. Racial and ethnic disparities in HIV testing during the COVID-19 era in the U.S.: A retrospective analysis of nation-wide estimates from N3C data. Submitted to Lancet HIV.

4. Hannah MacDougall, School of Social Work, Summer 2024 to present.
   *Manuscript:* Hannah MacDougall, PhD, MSW Haishan Yang, PhD Alexis Swendener, PhD. Rural Nonprofit Hospital Financial Assistance Spending: Implications for Medical Debt. Submitted to Health Service Research